**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
............................................................................X

TERRI MIEHLE-KELLOGG,
*individually and as Administratrix of the Estate*
*of Walter Kellogg, deceased,*
TERRI MIEHLE-KELLOGG, *individually*

                    Plaintiffs,

                -against-

OFFICER JOHN DOE *individually and in his*
*capacity as a Police Officer of the Suffolk*
*County Police Department*, COUNTY OF
SUFFOLK, SUFFOLK COUNTY POLICE
DEPARTMENT

                    Defendants.
............................................................................X

**MEMORANDUM OF**
**DECISION & ORDER**

19-CV-4943(GRB)(JMW)

FILED
CLERK

1:36 pm, Mar 24, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**GARY R. BROWN, United States District Judge**:

**Appearances:**

Mark Kujawski
Kujawski & Kujawski
*Attorney for Plaintiffs*
1637 Deer Park Avenue
P.O. Box 661
Deer Park, NY 11729

Brian Mitchell
Assistant County Attorney
*Attorney for Defendant County of Suffolk*
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, NY 11788

       Before the Court are plaintiffs' motion to amend their complaint to substitute the name of

Officer Frank Santanello for the "Officer John Doe" and defendants' motion for summary

judgment.  For the following reasons, the plaintiffs' motion to amend the complaint is **DENIED**

and defendants' motion for summary judgment is **DENIED IN PART** and **GRANTED IN PART**. Specifically, while most of the claims are subject to dismissal, the Court finds that, drawing all inferences in plaintiffs' favor, sufficient disputed facts remain as to the failure-to-supervise claim regarding Officer Santanello and there is sufficient evidence supporting a *Monell* pattern or practice such that the claim must proceed to trial.

## I. BACKGROUND

Based on the parties' Rule 56.1 Statements and the Court's review of the evidence submitted, the material undisputed[1] facts include the following:

### a. *The Death of Walter Kellogg*

On December 15, 2018, Terri Miehle-Kellogg ("plaintiff") called 911 seeking help for her husband Walter Kellogg ("plaintiff-decedent," collectively "plaintiffs") who was experiencing a mental health crisis. Docket Entry ("DE") 27-3, Def. R. 56.1 Statement, ¶ 2; DE 28-1, Pl. R. 56.1 Counterstatement, ¶ 2. Ms. Miehle-Kellogg told the dispatcher that her husband was suicidal, had a history of mental health issues, and was not acting violent towards anyone. DE 27-3, ¶ 2; DE 28-1, ¶ 2. Officer Frank Santanello arrived at the house and then walked with Ms. Miehle-Kellogg toward the door of the house. DE 27-3, ¶¶ 3-4; DE 28-1, ¶¶ 3-4. Upon approaching the doorway, Officer Santanello asked Mr. Kellogg to come outside and speak with him. DE 27-3, ¶ 6; DE 28-1, ¶ 6. Ms. Miehle-Kellogg opened the door, and Mr. Kellogg came out with a 1.5-inch paring knife in his right hand. DE 27-3, ¶¶ 7, 10; DE 28-1, ¶¶ 7, 10; DE 27-7, Miehle-Kellogg Dep. at 97. Officer Santanello then asked about Mr. Kellogg's intentions. He replied, "I want to cut myself, I want to go to the hospital." DE 27-3, ¶¶ 15-16; DE 28-1, ¶¶ 15-16.

---

[1] For the purposes of summary judgment only, defendants do not dispute certain facts based on the deposition testimony of Ms. Miehle-Kellogg since the standard requires the Court to view the facts in the light most favorable to the non-moving party. DE 27-3, Def. R. 56.1 Statement, n.1.

Ms. Miehle-Kellogg took the knife out of her husband's hand, reached around Mr. Kellogg, and placed the knife on a microwave oven next to the door.  DE 27-3, ¶¶ 11, 18; DE 28-1, ¶¶ 11, 18.  At this point, Ms. Miehle-Kellogg was standing just outside the door, Mr. Kellogg was in the doorway, and Officer Santanello was by a table in the yard across from the doorway.  DE 27-3, ¶¶ 9, 13-14; DE 28-1, ¶¶ 9, 13-14.  Ms. Miehle-Kellogg walked a few steps in front of Mr. Kellogg, and then he took out a utility knife.  DE 27-3, ¶¶ 19-20; DE 28-1, ¶¶ 19-20; DE 27-7, Miehle-Kellogg Dep. at 102.  Mr. Kellogg lifted his shirt and said, "I'm going to cut myself stem to stern," and proceeded to slice his skin with two cuts.  DE 27-3, ¶ 21; DE 28-1, ¶ 21.  At this point, Ms. Miehle-Kellogg heard several gunshots.  DE 27-3, ¶ 22; DE 28-1, ¶ 22.[2]  When Ms. Miehle-Kellogg heard the shots, she was about three feet from her husband and the officer was behind her by the table.  DE 27-3, ¶¶ 26-27; DE 28-1, ¶¶ 26-27.[3]  According to plaintiffs' ballistics expert, Officer Santanello shot Mr. Kellogg six times from a distance of greater than 36 inches.  DE 28-1, ¶ mm; DE 28-3, Ex. 1, Valentin Expert Report.  Mr. Kellogg was likely within two or three feet of the front door when he was shot.  DE 28-1, ¶ mm; DE 28-14, Ex. 12, Knox Expert Report.  Ms. Miehle-Kellogg alleges she was unlawfully detained by the officer following the shooting.  DE 1, Compl. at ¶ 9.

Plaintiffs did not file a Notice of Claim pursuant to the New York State General Municipal Law in relation to any of the claims arising out of Mr. Kellogg's death.  DE 27-3, ¶ 41; DE 28-1, ¶ 41.

### b. *Officer Frank Santanello*

---

[2] It is disputed whether Officer Santanello told Mr. Kellogg to put the knife down as Mr. Kellogg was cutting himself. DE 27-3, ¶ 28; DE 28-1, ¶ 28.  In her deposition, Ms. Miehle-Kellogg initially testified that Officer Santanello "just shot" and did not say anything, but later testified that Officer Santanello told her husband to put the knife down as he was cutting himself.  DE 27-7, Miehle-Kellogg Dep. at 110-11.
[3] According to Officer Santanello, Mr. Kellogg charged at him.  DE 28-5, Santanello Dep. at 95-96; DE 28-1, ¶ 21. However, this is disputed, and the defendants are not relying on this assertion.  *See supra* note 1.

Officer Santanello has been the subject of at least twenty-one investigations by the Internal Affairs Bureau ("IAB") during his time as an officer. *See* DEs 27-11–27-23, Exs. F–R; DEs 28-6–28-13, Exs. 4-11. Of the thirteen investigations regarding Officer Santanello's use of excessive force before Mr. Kellogg's death, the IAB found the allegations were unsubstantiated in eight instances and "exonerated" him in five. DE 27-3, ¶¶ 32-34. Following Mr. Kellogg's death, five IAB investigations found that allegations against Officer Santanello for failure to perform duty, making false statements, improper police conduct, unprofessional language, and rules and procedures violations were substantiated. *See* DE 28-6, Ex. 4; DE 28-8, Ex. 6; DE 28-10, Ex. 8; DE 28-11, Ex. 9; DE 28-12, Ex. 10. Below is a summary of three[4] IAB reports regarding Officer Santanello in cases involving excessive force or mentally ill individuals.

i.   *Irizarry: Suffolk Internal Affairs Report 17-60i*

In January 2017, Patricia Irizarry filed a civilian complaint alleging officers, among other things, had fractured her ribs and injured her head when taking her to the hospital. *See* DE 27-18, Ex. M. A social worker called 911 after having received authorization to involuntarily commit Irizarry at the Stony Brook Comprehensive Psychiatric Emergency Program (CPEP). *Id.* at 5, 7. The social worker told 911, "She is not violent, but she is very well known to police in this sector and I'm anticipating her being very resistant to going to CPEP." *Id.* at 5. Officer Santanello claims he and his partner took Irizarry into custody "without incident" after making a forced entry into her home. *Id.* at 8.

In her complaint, Irizarry alleged that officers "stomped" on her, called her "c**t," threatened to "f**k" her, threw her in the back of an SUV, and "split" her head open by stopping the vehicle short. *Id.* at 5-6. A friend who observed the apprehension similarly stated the police

---

[4] Although there are many more allegations of misconduct by Officer Santanello that may very well assist a jury in considering this matter, the Court need not recount them here to decide the instant motion.

"stomped" on Irizarry. *Id.* at 7. At the hospital, the officers noticed a head laceration and advised hospital staff she needed medical attention. *Id.* at 8. Officer Santanello overheard Irizarry advise hospital staff the officers had broken her ribs. *Id.* Hospital records indicated Irizarry suffered "laceration of scalp, multiple rib fractures, and psychiatric problem." *Id.* at 3. A physician noted, "Pt. reports she has an injury to the back of her head following an altercation with police. . .. Imaging was notable for acute mildly displaced fractures involving the lateral right sixth, seventh and eighth ribs, as well as acute mildly displaced fracture of the left sixth and seventh ribs . . .." *Id.* During his interview with IAB, Officer Santanello denied kicking or stomping Irizarry, throwing her into a vehicle or using foul language. *Id.* at 8.[5]

The IAB's December 2017 report concluded the excessive force claim was unsubstantiated. *Id.* at 9. The report concluded the testimony of Irizarry's friend was incredible because she used the same word as Irizarry – "stomp" – to describe the alleged physical abuse, which investigators found was suggestive of coaching. *Id.* Since the partition in the police vehicle exposed occupants to the edge of the plexiglass, the report found it probable that Irizarry struck her head while in transit.[6] *Id.* at 2, 10. The investigation rejected several allegations made by Irizarry, arguably for good reason. Yet, the report acknowledged Irizarry suffered multiple fractured ribs but IAB made no effort to explain the source of this serious and irrefutable injury. *Id.* at 10. The report recommended no training or disciplinary action for Officer Santanello, nor any procedural modifications or rules and procedures amendments. *Id.*

   ii.   *Urgilez: Suffolk Internal Affairs Report 18-864i*

---

[5] Like several other IAB rports submitted on this motion, investigators interviewed a second officer involved in the incident, but provides no detail other than the conclusory statement that, "His account is consistent with Santanello's." *Id.* at 9.

[6] A subsequent IAB report noted that this defect in the vehicle's plexiglass installation was repaired after another individual was also injured in transit. *See* DE 27-19 at 17.

In November 2018, the IAB initiated an investigation regarding Officer Santanello's response to a report of a missing mentally ill person. *See* DE 28-12, Ex. 10. Vilma Urgilez called 911 in November 2018 to report that her schizophrenic relative had been missing for several days. *Id.* at 43. When Officer Santanello arrived, he told Urgilez in sum and substance, "[Y]ou are in America and are supposed to speak English." *Id.* Officer Santanello called a Spanish-speaking officer who then spoke with Urgilez over the phone and told her to come to the precinct. *Id.* at 43-44. Officer Santanello's field report merely stated that Urgilez would report the incident at the precinct. *Id.* at 42. Urgilez filed a missing person report with another officer the following day, and her family member was later found at a hospital. *Id.* at 44.

The IAB's July 2019 report concluded that the claim of failure to perform duty was substantiated because Officer Santanello filed an incomplete field report instead of a missing person report. *Id.* at 40, 45. As Officer Santanello did not deny telling Urgilez she should speak English in America, the report concluded that the claims of conduct unbecoming and unprofessional language/attitude were substantiated. *Id.* Finally, the report concluded that Officer Santanello violated numerous rules and procedures by not transmitting his arrival at Urgilez's call, failing to properly complete forms, and failing to follow language-access protocols. *Id.* at 41-42, 45. Nevertheless, the report recommended no training or disciplinary action for Officer Santanello, nor any procedural modifications or rules and procedures amendments. *Id.* at 42, 46.

### iii.   Dono: Suffolk Internal Affairs Report 20-253i[7]

In June 2020, Laura Dono filed a civilian complaint alleging Officer Santanello refused to render her assistance during a welfare check, resulting in her hospitalization. DE 28-8, Ex. 6.

---

[7] Even though Dono's complaint was filed after Mr. Kellogg's death, it is still relevant insofar as it shows a continuing *Monell* pattern or practice. *Cf. Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (Nathan, J.) ("That a report was published after the subject incident does not prevent plaintiffs from relying on it— provided plaintiffs plead other allegations from which the court may infer high-level policymakers' acquiescence.").

While walking home from a Walmart location, Dono stopped at a Dunkin' Donuts because she felt unwell. *Id.* at 9.  Dono called 911 to ask for a ride home as she had done on prior occasions. *Id.* Officer Santanello had had at least four prior dealings with Dono and knew she suffered from mental illness and was physically unhealthy. *Id.* at 3, 7, 10.  Although video surveillance showed Officer Santanello speaking with no one at the scene, Officer Santanello claimed patrons at the Dunkin' Donuts told him Dono was harassing others and rummaging through garbage. *Id.* at 6, 9-10.  Officer Santanello told Dono he would not give her a ride home because he did not want to facilitate her behavior. *Id.* at 6.  According to Dono, Officer Santanello was "very nasty" and refused to give his name or shield number. *Id.* at 5.  Officer Santanello denies using foul language or that Dono ever asked for his name or shield number. *Id.* at 6.  As Dono resumed her walk home, she had difficulty breathing and called 911 again. *Id.* at 9.  She was then taken to the ER and hospitalized for three days. *Id.* at 2-3.  The doctor classified Dono as "critically ill" with a high probability of imminent or life-threatening deterioration due to rapid atrial fibrillation. *Id.* at 2-3, 10.

The IAB's December 2020 report found that Officer Santanello fabricated the complaint against Dono in order to justify his failure to render assistance because the video surveillance showed Santanello did not interact with anyone at Dunkin' Donuts except Dono. *Id.* at 10.  In the words of the report, "Santanello was more concerned with teaching Dono a lesson" than "assisting a mentally ill vulnerable citizen" and "displayed no compassion or empathy." *Id.*  Accordingly, the report concluded that the claims of lying and failure to perform duty were substantiated. *Id.* The rules and procedures violation for inaccurate completion of forms was substantiated because Officer Santanello's field report inaccurately stated Dono was waiting for a ride and omitted Dono's pedigree information although he was the primary officer on four prior calls involving

Dono.  *Id.*  The claim of unprofessional language/attitude was unsubstantiated because there was no additional evidence to prove or disprove the allegation.  *Id.*  The report recommended no training or disciplinary action for Officer Santanello, nor any procedural modifications or rules and procedures amendments.  *Id.* at 8.

***

Officer Santanello received no training or discipline for any of the above incidents.  After twenty-one investigations, Officer Santanello has been disciplined once with three-months unpaid suspension for providing alcohol to minors in 2006 and training has been recommended once in 2016 for failing to fill out a detailed field report.  *See* DE 28-9, Ex. 7 at 70; DE 28-5, Santanello Dep. at 20; DE 27-16, Ex. K, at 4.

### c. *Suffolk County's Training and Rules and Procedures for Possible Mental/Emotional Issues ("PMIs")*

Chapter 9, Section 6 of the Suffolk County Police Department Rules and Procedures "Police Response to Incidents Involving Persons with Possible Mental/Emotional Issues (PMI)" was in effect at the time of the subject incident and outlines the manner in which police officers are to engage with mentally ill and/or emotionally disturbed persons.  DE 27-6, Ex. A.  If "[a] person appears to be a PMI" and is making "threats or attempts of suicide," they shall be "take[n] . . . into custody involuntarily and transport[ed] . . . to CPEP."  *Id.* at 143, Subsection VI. B. 2a.  When dealing with an armed or violent PMI, "[i]f confrontation is immediate and unavoidable, physical force shall be used only to the extent necessary to prevent injury, and to maintain control of the PMI."  *Id.* at  147-48, Subsection VI. C. 4.  "Deadly physical force shall be used ONLY as specified in Chapter 2, Section 12, Use of Force – Use of Firearms and Deadly Physical Force."  *Id.*  Officer Santanello testified that he received training on how to respond to PMIs in the police

academy, on the job, and in annual training by watching videos on the computer.  DE 28-5, Santanello Dep. at 31; DE 27-3, ¶ 31.

   *d.  The Complaint*

   The complaint, filed on August 29, 2019, names an "Officer John Doe" as a defendant in both his individual and official capacities.  *See* DE 1, Compl.  The complaint asserts a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12132; a claim for municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); a claim for violation of the right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments; and state law claims for negligence, assault, battery, unlawful detention, negligent and intentional infliction of emotional distress, and intentional tort.  *See id.* at 5-8.  The proposed summons filed concurrently with the complaint was rejected by the Clerk's Office as incomplete.  *See* August 29, 2019 Electronic Order.  An amended summons was filed on August 29, 2019 and issued by the Court the following day.  *See* DEs 4-5.  The amended summons as to the unnamed officer then read: "Officer John Doe, individually and in his capacity as a Police Officer of the Suffolk County Police Department, c/o Suffolk County Police Department, 30 Yaphank Avenue, Yaphank, New York 11980."  DE 5, Amended Summons.  The summons listed the same address for the Suffolk County Police Department.  *Id.*

   Plaintiffs did not file an affidavit of service indicating when or whether service was completed.  As to Officer Santanello, in a letter, plaintiffs' counsel states – without further citation or documentation – that "[t]he County accepted service on behalf of all of its officers, including Santanello."  DE 24, Pl. Reply Letter at 2.  The County interposed its answer on December 20, 2019.  DE 6.  The answer indicates it was filed on behalf of only the County, though several of the numbered paragraphs refer to the "defendants' actions," plural.  *See, e.g.*, DE 6, Answer, at ¶ 13.

9

That Frank Santanello was the officer who responded to the call and shot plaintiff-decedent is undisputed.  Indeed, the County identified Officer Santanello as the only officer involved in the shooting in its interrogatory responses provided to plaintiff on August 20, 2020.  *See* DE 29-11, Interrogatory Response Number 3, at 4.  Further, plaintiffs filed a motion to compel production of Santanello's personnel file on October 2, 2020, demonstrating unequivocal knowledge of the "John Doe" officer's identity as of that date.  *See* DE 13, Letter Mot. to Compel.  And, on March 17, 2021, Officer Santanello was deposed at the County's office, a deposition defended by then Deputy Suffolk County Attorney Brian Mitchell.  DE 29-1, Pl. Brief at 8, 10.

Against this backdrop, the Court turns to the motions at bar.

## II.      DISCUSSION

### a.   *Motion to Amend*

At this late juncture, having failed to properly or timely serve Officer Santanello with process, plaintiffs now seek to amend the complaint to substitute him for the "John Doe" defendant.  Due to the expiry of the relevant limitations periods, however, the motion is without basis.  "'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.'" *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993)).  While plaintiffs raise several theories to permit such amendment, each theory fails.

### i.   *Rule 15(a)*

Rule 15 provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Amendment will not be permitted, however, where the amendment would be futile.  "A motion to amend the complaint is futile if the claims sought to be

10

added are barred by the relevant statute of limitations." *Anderson v. Inc. Vill. of Hempstead*, No. 15-CV-1485 (JS)(SIL), 2020 WL 999856, at *2 (E.D.N.Y. Mar. 2, 2020).  Here, the parties agree that the statute of limitations had run at the time of the proposed amendment.  Thus, the relief contemplated in this section of the rule is not available to plaintiffs unless plaintiffs can establish that the claims relate back under Rule 15(c).

### ii.    *Rule 15(c)*

"Although a defendant can initially be named as a John Doe defendant, failure to name that defendant within the applicable statute of limitations period requires dismissal of the claim." *Rochester v. County of Nassau*, No. 10-CV-6017 (PKC)(SLT), 2019 WL 955032, at *3 (E.D.N.Y. Feb. 27, 2019) (issuing *sua sponte* dismissal of John Doe claim in a factually similar case).  Thus, "John Doe" substitutions "may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met." *Hogan*, 738 F.3d at 517 (quoting *Aslanidis*, 7 F.3d at 1075).  Rule 15(c) of the Federal Rules of Civil Procedure provides as follows:

(c) **Relation Back of Amendments.**

(1) **When an Amendment Relates Back.** An amendment to a pleading relates back to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

11

> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Plaintiffs cannot satisfy these requirements. This is not a case in which plaintiffs were mistaken as to the identity of a party at the time of filing and now seek to remedy that misidentification. Rather, plaintiffs merely lacked knowledge of the officers' name at the time of filing. In this Circuit, amendment in this instance is impermissible. *Hogan*, 738 F.3d at 518 ("This Court's interpretation of Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.'") (quoting *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 470 (2d Cir. 1995)).[8]

Under Rule 15(c)(1)(A), an amended pleading may relate back to an earlier-filed complaint when "the law that provides the applicable statute of limitations allows relation back." *Hogan*, 738 F.3d at 518-19. New York state law provides the three-year statute of limitations applicable to § 1983 claims.[9] Further, where the state law regarding relation back is more generous than the federal law, the state law will be applied. *Liverpool v. Davis*, 442 F. Supp. 3d 714, 725 (S.D.N.Y. 2020) ("[I]f the applicable statute of limitations is determined by state law — as is the case here — courts should assess both the state and federal relation back doctrines and apply whichever law is more generous.") (citation omitted). New York state law provides a "more forgiving principle of relation back" for cases involving John Doe defendants and will therefore be applied. *Hogan*, 738 F.3d at 518.

---

[8] "Several cases have questioned whether *Barrow* is still good law after the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010). [However,] *Krupski* is [ ] distinguishable from cases like *Barrow* and this case, which involve John Doe defendants." *Bender v. City of New York*, No. 14-CV-4386 (LTS)(GWG), 2015 WL 524283, at *4 (S.D.N.Y. Feb. 10, 2015) (collecting cases).

[9] Section 1983 actions filed in New York are subject to a three-year statute of limitations. *Montague v. City of Rochester*, No. 21-1598-pr, 2022 WL 16558154, at *1 (2d Cir. 2022) (citing *Hogan*, 738 F.3d at 517). The incident leading to Plaintiff-Decedent's death occurred on December 15, 2018, meaning the statute of limitations expired on December 15, 2021.

The New York Civil Practice Law and Rules ("CPLR") provide a special amendment procedure for claims alleged against John Doe defendants.  Section 1024 provides:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known.  If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. CPLR § 1024.  To obtain the benefit of Section 1024, however, a plaintiff must demonstrate that he/she "exercise[d] due diligence, prior to the statute of limitations, to identity the defendant by name."  *Hogan*, 738 F.3d at 519 (quoting *Bumpus v. N.Y.C. Transit Auth.*, 883 N.Y.S.2d 99, 104 (2d Dep't 2009)); *see also Barrett v. City of Newburgh*, 720 F. App'x 29, 33 (2d Cir. 2017) ("Section 1024's 'due diligence' requirement is not forgiving. The onus of identifying an officer defendant's name, or at least making a good faith effort, lies on the plaintiff.") (citation omitted).  Also, like Fed. R. Civ. P. 15, New York law provides for relation back only in the event of a mistake as to the identity of the proper parties.  *Liverpool*, 442 F. Supp. 3d at 726 ("The result would be no different if the Court were to apply New York's relation-back rules … As the New York Court of Appeals has explained, the New York rule also requires that a plaintiff make a 'mistake' as to the identity of the proper parties.") (citing *Buran v. Coupal*, 87 N.Y.2d 173, 176 (1995)).

Here, Section 1024 does not provide a basis for plaintiffs' proposed amendment to relate back to the original date of filing.  Plaintiffs did not file their request to amend the complaint until January 31, 2022, indisputably well after the statute of limitations had run.  *See* DE 24, Pl. Letter Motion.  Plaintiffs were aware of Officer Santanello's identity, at the latest, as of his deposition on March 17, 2021—long before the statute of limitations had run.  Further, defendants had identified Officer Santanello in their August 20, 2020 responses to plaintiffs' interrogatories,

giving plaintiffs even more time to properly amend.  Though plaintiffs point to the County's delay in responding to their initial inquiry seeking the name of the officer involved in the shooting, this fact alone does not warrant a different outcome.  *Young v. Lugo*, No. 18-CV-04216 (JS)(JMW), 2021 WL 5989106, at *8 (E.D.N.Y. Dec. 17, 2021) ("Even assuming Plaintiff exercised due diligence before initiating suit, the fact that Plaintiff identified Defendant Provenzano before the limitations period expired also bars Plaintiff from utilizing Section 1024.").  Thus, plaintiffs' proposed amended complaint does not relate back under Section 1024.

### iii.    *Rule 17(d)*

Plaintiffs' invocation of Rule 17(d) similarly fails.  Rule 17(d) provides that "[a] public officer who sues or is sued *in an official capacity* may be designated by official title rather than by name, but the court may order that the officer's name be added."  Fed. R. Civ. P. 17 (emphasis added).  Thus, this section is inapplicable as to the claims asserted against Officer Santanello in his individual capacity.  *See Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Markets*, 847 F.2d 1038, 1042 n.3 (2d Cir. 1988) (substituting predecessor for successor as to official capacity claims but continuing individual capacity claims against predecessor); *Am. C.L. Union of Mississippi, Inc. v. Finch*, 638 F.2d 1336, 1340 (5th Cir. 1981) (applying predecessor to Rule 17(d) and allowing substitution only as to official capacity claims where plaintiff had asserted both individual and official capacity claims).  Therefore, any claims plaintiffs may have had against Officer Santanello in his individual capacity remain time barred.

Assuming *arguendo* that plaintiffs are correct that the officer's name could be added as to the claims against him *in his official capacity*, the amendment would nonetheless be futile as the County is named in the complaint, rendering any "official capacity" claims against Officer Santanello redundant.  *Stancati v. Cnty. of Nassau*, No. 14-CV-2694 (JS)(ARL), 2015 WL

1529859 at *2 (E.D.N.Y. 2015) ("Here, because the County is named in the Complaint, the claims against Sheriff Sposato and Deputy Sheriff Gorey in their official capacities must be dismissed as duplicative and redundant.").

For these reasons, plaintiffs' motion to amend the complaint to include Officer Santanello is denied and the claims against John Doe are dismissed.

### b.   *Motion for Summary Judgment*

The motion for summary judgment is decided under the oft-repeated and well understood standard of review, as discussed in *Callahan v. Cnty. Of Suffolk*, 602 F. Supp. 3d 399, 406–07 (E.D.N.Y. 2022) with respect to cases involving an excessive force claim, which discussion is incorporated by reference herein.

### i.   *Qualified Immunity*

The defense of qualified immunity protects government officials sued in their individual capacity. *See O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) ("A government official sued in his individual capacity is entitled to qualified immunity"). Because the motion to add Officer Santanello as a named defendant is denied herein, only a "John Doe" defendant remains, and the claim must be dismissed. *Barrow*, 66 F.3d at 467 (affirming judgment dismissing John Doe claims where substitution was not timely made). The question of qualified immunity, therefore, has been rendered moot. *See Gonzalez v. New York City*, No. 16-CV-254 (CM), 2016 WL 7188147, at *6 (S.D.N.Y. Dec. 2, 2016) ("Until [Defendant CO John Doe is named and sued], there is no defendant entitled to invoke qualified immunity, only a placeholder name."); *Cain v. Cnty. Of Niagara, New York*, No. 20-CV-1710S, 2022 WL 2134288, at *12–13 (W.D.N.Y. June 14, 2022) (same).[10]

---

[10] Even assuming qualified immunity were available, the defense proves unavailing on summary judgment. Drawing all inferences in favor of the plaintiffs, the facts here suggest that the officer fired six rounds at an unthreatening

ii.      *Monell* **Liability**

Under *Monell*, a municipality can be held liable for violations of Section 1983 if a deprivation of the plaintiff's rights is caused by a governmental custom, policy, or usage of the municipality.  *See Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978).  "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted).  "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).  As such, "when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority."  *Id.* at 126.  This can be established by showing a policymaking official exhibited "deliberate indifference."  *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  The Second Circuit has described the standard for finding *Monell* liability under a theory of deliberate indifference as follows:

> To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights. " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S.Ct. 1382. We have held that demonstration of

---

suicidal individual armed only with a utility knife, a constitutionally unreasonable deployment of deadly force.  "No reasonable officer could think that a suicidal, non-criminal individual holding a small paring knife and otherwise acting in a nonthreatening manner . . .  presents justification to deviate from *Garner's* bright-line proscription [against using deadly force absent a threat of death or serious injury to the officer or others]."  *Connor v. Thompson*, 647 F. App'x 231, 239 (4th Cir. 2016) (denying qualified immunity to an officer who fired two shots at a suicidal plaintiff-decedent who disobeyed orders to drop a small paring knife).

> deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent. *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir.2011); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995). *See also City of Canton*, 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.").

*Jones v. Town of E. Haven*, 691 F.3d 72, 81–82 (2d Cir. 2012).

A deliberate indifference claim may be raised under a theory of failure to train or failure to supervise. *Amnesty Am.*, 361 F.3d at 127. A failure-to-train theory requires a "specific deficiency in the city's training program" that is closely related to the injury such that it "actually caused" the constitutional violation. *Id.* at 129 (citing *City of Canton*, 489 U.S. at 391); *see also Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (establishing three-pronged test for deliberate indifference in a failure-to-train claim). A failure-to-supervise claim may be established by showing "that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*

"Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate." *H.H. v. City of New York*, No. 11-CV-4905 (NG)(ST), 2017 WL 3396434, at *8 (E.D.N.Y. Aug. 7, 2017) (citing *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force.")). "[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal

17

custom, policy, or usage that would justify municipal liability." *Jones*, 691 F.3d at 81.  However, "because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability." *Amnesty Am.*, 361 F.3d at 127.

Here, there is ample evidence to support a jury finding that the County was deliberately indifferent to the danger Officer Santanello allegedly posed to mentally ill individuals, not only based on the extraordinary number and type of allegations made against this officer, but also because of the County's plainly inadequate responses thereto.  For example, a mentally ill woman Officer Santanello escorted to Stony Brook's psychiatric ward indisputably yet inexplicably arrived with multiple fractured ribs.  Notwithstanding these facts and the account of a third-party eyewitness that the officers assaulted her, the Internal Affairs Bureau concluded the excessive force claim was unsubstantiated without further investigating or explaining the manner in which these injuries occurred.  *See* DE 27-18 at 10.  A month before Officer Santanello shot and killed Mr. Kellogg, he failed to file a missing person report regarding a schizophrenic man, telling the reporting civilian that, "[Y]ou are in America and are supposed to speak English," even though he had access to a Spanish-speaking officer to provide translation.  *See* DE 28-12 at 40, 43, 45.  Approximately eighteen months after killing Mr. Kellogg, Officer Santanello refused to provide aid to a stricken individual though well aware of her physical and mental health conditions.  *See* DE 28-8 at 10.  Shortly thereafter, the woman was rushed to the ER and hospitalized for days.  *Id.* at 2-3.  The Internal Affairs Bureau found "Santanello was more concerned with teaching [her] a lesson" than "assisting a mentally ill vulnerable citizen," and described him as lacking "compassion or empathy."  *Id.* at 10.  Moreover, Officer Santanello made false statements that the woman was harassing others in order to justify his failure to assist her.  *Id.*  Despite the mounting

18

evidence of Officer Santanello's animus towards the mentally ill and his willful disregard of their needs both before and after Mr. Kellogg's untimely death, the County took no actions to train or discipline Officer Santanello for the aforementioned misconduct.

As these repeated complaints against Officer Santanello were "followed by no meaningful attempt . . . to investigate or to forestall further incidents," a reasonable jury may infer deliberate indifference giving rise to *Monell* liability.  *See Vann*, 72 F.3d at 1049 (holding that a reasonable jury could find *Monell* liability where an officer had been subject to numerous complaints of excessive force and other police misconduct).  Here, as in *Vann*, many of the complaints were deemed not substantiated.  *Id.* at 1042–45 (2d Cir. 1995) (listing withdrawn or conciliated complaints against officer).  Nonetheless, in *Vann* "the need to be alert for new civilian complaints . . . was obvious" given the officer's disciplinary history and "violent-prone" temper. *Id.* at 1051. Here the pattern of alarming allegations against Officer Santanello – ranging from wanton disregard of duty to broken ribs – put the County on notice of the risk of egregious constitutional violations, and the failure to meaningfully respond to these allegations may raise the reasonable inference of deliberate indifference.

Defendants have failed to demonstrate that the County made a "meaningful attempt" to investigate or forestall Officer Santanello's troubling pattern of misconduct.  First, the County spuriously argues that none of the civilian complaints are sufficiently similar to the instant case to establish a pattern of similar constitutional violations.  Before Mr. Kellogg's death, complaints were brought against Officer Santanello for using excessive force against mentally ill individuals and, portentously, he or his partner allegedly told a knife-wielding suicidal man that they should have shot him.  *See* DE 27-17 at 4.  The County claims they appropriately responded to the thirteen complaints brought against Officer Santanello before Mr. Kellogg's death because they were all

investigated resulting in IAB findings of exoneration or lack of substantiation.  Yet, obvious inadequacies in a municipality's investigation of such complaints could undermine those efforts. *See Fiacco*, 783 F.2d at 328.  The Internal Affairs Bureau failed to explain the circumstances under which Officer Santanello delivered a mentally ill woman to a psychiatric ward with multiple fractured ribs.  *See* DE 27-18 at 10.  This single insufficient investigation of Officer Santanello's conduct, standing alone, could provide a basis for municipal liability for deliberate indifference. Inconceivably, though, it does not stand alone.

Deliberate indifference to Officer Santanello's conduct evinces a stunning failure to meaningfully investigate the alarming allegations brought against him, thereby providing a basis for municipal liability.  *See Amnesty Am.*, 361 F.3d at 129 ("witnessing of a single, isolated act of brutality might be sufficient to allow a factfinder to infer deliberate indifference if the use of force were so extreme as to leave no doubt that [the policymaker] consciously chose not to act"); *see also Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392–93 (S.D.N.Y. 2013) (finding plausible claim that policymakers were deliberately indifferent to the constitutional rights of mentally/emotionally disturbed persons under a single-incident theory).  Although, as defendants argue, the Court cannot assume *ipso facto* that unsubstantiated civilian complaints are evidence of constitutional violations, *see Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 409 (E.D.N.Y. 2011), the Court also cannot assume the converse, that unsubstantiated civilian complaints are *not* evidence of potential constitutional violations.  Rather, "[t]he fact that none of the claims had yet been adjudicated in favor of the claimant was not material[] if the [County's] efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth," as may be the case here.  *Fiacco*, 783 F.2d at 328.  Plaintiffs have raised sufficient evidence to overcome the motion for summary judgment, permitting these matters to proceed to trial.

Even assuming the County acted with deliberate indifference, defendants argue plaintiffs still fail to establish causation. Under a failure-to-train theory, the "plaintiffs [must]. . . identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391). It is undisputed that Officer Santanello received training regarding PMIs in the academy, on the job, and in annual training videos. DE 28-5 at 31; DE 27-3, ¶ 31. In support of the failure-to-train claim, plaintiffs cite a *Newsday* article,[11] which is inadmissible hearsay; a Suffolk County press release announcing a new training program,[12] which makes no mention of prior deficiencies in training officers how to respond to the mentally ill; and a 2017 Department of Justice report, which primarily concerns the treatment of Latinos and makes no mention of Suffolk County's training for PMIs. *See* DE 28-24, Ex. 22. As such, plaintiffs have failed to identify any aspect of Suffolk County's training program for handling mentally ill people which could have caused the alleged constitutional violation. Consequently, plaintiffs have failed to satisfy a crucial element of their failure-to-train claim. *See Amnesty Am.*, 361 F.3d at 130–31 (dismissing failure-to-train claim where plaintiffs offered inadequate evidence of how officers were trained or how better training could have prevented the constitutional violation). For these reasons, defendants are granted summary judgment on the failure-to-train *Monell* claim.

Unlike a failure-to-train claim, a failure-to-supervise claim does not require a heightened showing of causation. *See Amnesty Am.*, 361 F.3d at 127 n.8 ("While . . . a failure to train claim

---

[11] *Suffolk highlights 3 mental health programs as part of police reform*, NEWSDAY (Mar. 24, 2022), https://www.newsday.com/news/suffolk-police-reform-mental-programs-qxm9aad8.
[12] *Suffolk county Executive Bellone Announces Mental Health Awareness Training For Suffolk County Police Officers*, Press Release (Jan. 19, 2019), https://www.suffolkcountyny.gov/News/ArtMID/583/ArticleID/2574/Suffolk-county-Executive-Bellone-Announces-Mental-Health-Awareness-Training-For-Suffolk-County-Police-Officers.

also requires evidence . . . as to . . . the way in which [the municipality's training program] contributed to the violation.. . . in the context of a failure to supervise case, deliberate indifference may be established by showing that policymaking officials deliberately ignored an obvious need for supervision."). In *Amnesty Am. v. Town of W. Hartford*, for instance, although the plaintiffs failed to establish *Monell* liability under a failure-to-train theory because they did not identify a specific training deficiency, there was still a genuine dispute of material fact as to whether the police chief who witnessed his subordinates use excessive force was deliberately indifferent under a failure-to-supervise theory of *Monell* liability. *See id.* at 127–29. The history of excessive force and dereliction of duty allegations against Officer Santanello – particularly those involving the mentally ill – creates a genuine dispute as to whether the County was deliberately indifferent under a failure-to-supervise theory. *See Vann*, 72 F.3d at 1051 (whether indifference to civilian complaints empowered the officer to use unlawful force with perceived impunity is a question to be decided by the jury). As no heightened causation requirement is required, defendants are denied summary judgment on the failure-to-supervise *Monell* claim.[13]

>   iii.   **Remaining Claims**

Defendants argue the threadbare Americans with Disabilities Act claim lacks any evidentiary support, and the state law claims must be dismissed for failure to file a Notice of Claim. Plaintiffs have failed to oppose defendants' motion for summary judgment on the ADA and state law claims. As such, the Court deems these claims abandoned. *See Laface v. E. Suffolk BOCES*, No. 2:18-CV-1314 (ADS)(AKT), 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019). Thus,

---

[13] Plaintiffs also argue the County's failure to investigate the death of Mr. Kellogg supports their *Monell* claim. Plainly, however, the instant action cannot provide prior notice of a history of unconstitutional violations. *See Fiacco*, 783 F.2d at 328 ("the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question").

22

defendants are granted summary judgment on the ADA and state law claims.  Lastly, since the Suffolk County Police Department is not a suable entity, the Court *sua sponte* dismisses them from the case.  *See Paulette v. Suffolk Cnty. 5th Precinct Police Dep't*, No. 22-CV-2913 (JMA)(ARL), 2022 WL 2803360, at *3 (E.D.N.Y. July 18, 2022).

## III.    CONCLUSION

Based on the foregoing, plaintiffs' motion to amend the complaint to add the identity of Officer Santanello is **DENIED** and the claims against John Doe are **DISMISSED**.  Defendants' motion for summary judgment is **DENIED** as to the failure-to-supervise *Monell* claim and **GRANTED** as to the failure-to-train *Monell* claim, the ADA claim, and the state law claims. Finally, the Clerk of Court is respectfully directed to remove the Suffolk County Police Department and John Doe as defendants on the docket.  Counsel shall meet and confer to establish a joint schedule for submission of a pre-trial order and proposed trial dates.

**SO ORDERED.**

Dated: Central Islip, New York
           March 24, 2023

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge